

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

06 CV 492

ROBERT C. GUCCIONE,

                Plaintiff

-against-

MARC H. BELL, DANIEL C. STATON,
PENTHOUSE MEDIA GROUP, INC.,
CHARLES SAMEL, JASON GALANIS,
DR. LUIS ENRIQUE MOLINA GALEANA
a/k/a FERNANDO MOLINA,
INTERNET BILLING COMPANY, LLC, and
PENTHOUSE INTERNATIONAL, INC.,

                Defendants

Case No. 06 CV



**NOTICE OF REMOVAL**

    **PLEASE TAKE NOTICE** that the action captioned above (the "Action") is hereby removed from the Supreme Court of the State of New York, County of New York, Index No. 05/604465, to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§1446, 1441(c) and 1331. No further proceedings have occurred in the state action.

    **PLEASE TAKE FURTHER NOTICE** that the Defendants MARC H. BELL and PENTHOUSE MEDIA GROUP, INC., are entitled to remove the Action because it asserts a claim against those defendants for payment of severance benefits to which Plaintiff asserts he is entitled. Such claim arises under and is governed by the Employee Retirement Income and Security Act of 1974, 29 U.S.C. §1001 *et seq.* ("ERISA"), and is a separate and independent cause of action from the remaining claims set forth in the complaint. None of the other named defendants herein are

affected by the ERISA claim referenced herein except defendant Daniel C. Staton who, upon information and belief, has not been served as of the date herein. Accordingly, the consent of the non-removing defendants is not required. *Ell v. S.E.T. Landscape Design, Inc.,* 34 F.Supp.2d 188 (S.D.N.Y. 1999).

Dated: January 23, 2006
　　　　Garden City, New York

<div style="margin-left:40%">

**BERKMAN, HENOCH, PETERSON
& PEDDY, P.C.**
Attorneys for Defendants MARC H. BELL
and PENTHOUSE MEDIA GROUP, INC.

By:　　　

Ronald M. Terenzi (RT 6416)
Bruce D. Mael (BM 8038)
100 Garden City Plaza
Garden City, NY 11530
(516) 222-6200

</div>

TO:　　Penthouse International, Inc.,
　　　　Dr. Luis Enrique Fernando Molina Galeana
　　　　Charles Samel
　　　　Jason Galanis
　　　　Internet Billing Company, LLC
　　　　Pryor Cashman Sherman & Flynn LLP

O:\BHPP Department Data\Bankruptcy Department Data\Bruce Mael\Genmedia\guccione - removal.wpd

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT C. GUCCIONE,

                Plaintiff

      -against-

MARC H. BELL, DANIEL C. STATON,
PENTHOUSE MEDIA GROUP, INC.,
CHARLES SAMEL, JASON GALANIS,
DR. LUIS ENRIQUE MOLINA GALEANA
a/k/a FERNANDO MOLINA,
INTERNET BILLING COMPANY, LLC, and
PENTHOUSE INTERNATIONAL, INC.,

                Defendants

Case No. 06 CV

---

## DECLARATION OF CONSENT TO REMOVAL OF ACTION

MARC H. BELL, under penalty of perjury, declares as follows:

1. I am the Chairman of Penthouse Media Group, Inc. ("PMGI"), a defendant in the above-captioned action, as well as an individual defendant herein.

2. I hereby consent to the removal of this action from the Supreme Court of the State of New York, New York County, to the United States District Court for the Southern District of New York.

Dated: January 20, 2006

                                    MARC  H.  BELL,  individually  and  as
                                    Chairman of Penthouse Media Group, Inc.

O:\B\IPP Department Data\Bankruptcy Department Data\Bruce Mael\Genmedia\removal - consent.wpd

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ROBERT C. GUCCIONE,

                    Plaintiff,

          -against-

MARC H. BELL, DANIEL C. STATON,
PENTHOUSE MEDIA GROUP, INC.,
CHARLES SAMEL, JASON GALANIS,
DR. LUIS ENRIQUE MOLINA GALEANA
a/k/a FERNANDO MOLINA,
INTERNET BILLING COMPANY, LLC, and
PENTHOUSE INTERNATIONAL, INC.,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No. _____

Date Filed: _____ 0 5 6 0 4 4 6 5

**SUMMONS**

Plaintiff designates New
York County as the place
of trial. The basis for the
venue designated is
plaintiff's residence and
defendant Penthouse Media
Group Inc.'s residence.

*FILED*

DEC 23 2005

NEW YORK
COUNTY CLERK

**To the Above-Named Defendants:**

     YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a

copy of your answer or, if the complaint is not served with this summons, to serve a notice of

appearance, on the plaintiff's attorneys within (20) days after the service of this summons,

exclusive of the day of service; or within thirty (30) days after completion of service made in any

other manner than by personal delivery within the State. In case of your failure to appear or

answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:     New York, New York
           December 23, 2005

                    PRYOR CASHMAN SHERMAN & FLYNN LLP

                    By:   _____
                        Jamie M. Brickell
                        Ronald Giller
                        410 Park Avenue
                        New York, New York  10022

450509

1

(212) 421-4100
Attorneys for Plaintiff Robert C. Guccione

Defendants' Addresses:

Marc H. Bell
Marc Bell Capital Partners
6800 Broken Sound Parkway
Boca Raton, FL 33487
(561) 988-1700

Daniel C. Staton
2345 NW 46th St
Boca Raton, FL 33431
(561) 862-0561

Penthouse Media Group, Inc.,
2 Penn Plaza, Ste. 1125
New York, NY 10121
(212) 702-6000

Charles Samel
10501 Wilshire Blvd.
Unit 2005
Los Angeles, CA 90024-6329

Jason W. Galanis
1518 North Beverly Drive
Beverly Hills, California 90210-2314

Dr. Luis Enrique Molina Galeana
a/k/a/ Fernando Molina
c/o PHSL Worldwide p/k/a Penthouse Internacional, Inc.
2 Penn Plaza, Ste. 1125
New York, NY 10121

Internet Billing Company, LLC,
2200 SW 10th Street
Deerfield Beach, FL 33442-7622 USA
954-363-4400

PHSL Worldwide, p/k/a Penthouse International, Inc.
2 Penn Plaza, Ste. 1125
New York, NY 10121
(212) 702-6000

450509                                                    2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ROBERT C. GUCCIONE,

                             Plaintiff,

                       -against-

MARC H. BELL, DANIEL C. STATON,
PENTHOUSE MEDIA GROUP, INC.,
CHARLES SAMEL, JASON GALANIS,
DR. LUIS ENRIQUE MOLINA GALEANA
a/k/a FERNANDO MOLINA,
INTERNET BILLING COMPANY, LLC, and
PENTHOUSE INTERNATIONAL, INC.,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No. ____

**COMPLAINT**

05604465

       Plaintiff Robert C. Guccione, by his attorneys, Pryor Cashman Sherman & Flynn

LLP, for his Complaint against the Defendants, alleges as follows:

### PRELIMINARY STATEMENT

    1.     Plaintiff Robert C. Guccione ("Guccione") is the founder of Penthouse

Magazine, the individual who began an upstart challenger in the world of men's

publications and ended up building a multi-million dollar empire. Now, years later, he

has seen that empire destroyed, and he seeks, by this action, to collect damages from the

individuals and companies whose machinations contributed to his decline.

    2.     Specifically, Guccione brings this action against: defendant Penthouse

Media Group, Inc. ("PMG"), the successor to his own former company, General Media,

Inc. ("GMI"), to recover severance which PMG has improperly refused to pay; Marc H.

Bell ("Bell") and Daniel Staton ("Staton"), the successful acquirers of PMG out of the

bankruptcy, whose own breaches of contract, fraud, and frivolous bankruptcy filings have caused and threaten to further cause Guccione substantial harm; Charles Samel ("Samel") and Jason Galanis ("Galanis"), one a former employee and the other a former consultant, each of whom made fortunes through their dealings with plaintiff while driving his company into bankruptcy, by breaching agreements and their respective fiduciary duties owed to him, and committing fraud in their dealings with him; Dr. Luis Enrique Molina Galeana a/k/a Fernando Molina ("Molina"), a close colleague of Samel and Galanis who aided and abetted them in their effort to deceive Guccione into granting them rights from the various Penthouse companies to which they were not otherwise entitled; and Penthouse International, Inc. ("PII") and Internet Billing Company, LLC ("IBill"), the corporate vehicles used by Samel, Galanis and Molina to accomplish their improper acts.

3.      By this action, Guccione also asserts claims against Samel, Galanis, Molina, Bell and Staton in connection with their recent conspiracy to divide the spoils of the reorganized company amongst themselves after depriving Guccione of all of his rights and remaining assets.

### OVERVIEW OF THE CLAIMS

4.      Charles Samel is a man who owes his fortune and success to Guccione. And yet, throughout their relationship, Samel has repeatedly deceived and misled Guccione into believing that he was being faithful to him, all the while secretly planning to hijack Guccione's companies and profiteer for himself. Working closely at all times over the past five years with Jason Galanis and at various times with defendants Molina, Bell and Staton, defendant Samel has engaged in a pattern of outrageous conduct to Guccione's detriment.

435969                                    2

5.     For example, at a time when GMI suffered under extremely onerous financial burdens, Samel and Galanis convinced Guccione to empower them to finance or sell off his personal holdings in General Media International, Inc. ("GMII"), the company that held most of Guccione's personal property, to help defray some of GMI's cash flow issues. (Guccione owned two-thirds of GMII and a Guccione family trust owned the other third. GMII owned 99.5% of GMI.) As part of these supposed efforts to assist Guccione, Samel and Galanis mismanaged Guccione's personal assets, failed to maintain adequate records of the substantial sums Guccione "loaned" to GMI, then convinced Guccione to sign promissory notes from high interest rate lenders, pursuant to which he assumed personally liability for millions of dollars of indebtedness.

6.     Samel and Galanis also managed to extract hefty fees for themselves by orchestrating a series of questionable transactions, including a "reverse merger" by which GMI was combined into Penthouse International Inc. ("PII"), a public shell company with no assets. In the case of the PII merger, each took 5% of the public company for himself and sold portions of those shares for personal profit, even though they induced Guccione to go forward with the transaction in the first place by representing that shares of PII would be sold to raise monies to address GMI cash flow issues.

7.     Later on, after insinuating themselves into top level management positions with the public company, Samel and Galanis forged Guccione's name to false documents filed with the Securities and Exchange Commission ("SEC") relating to the recognition of income from a certain contract for internet services. As will be shown herein, a number of people connected with PII management were charged by the SEC. Guccione was ultimately able to clear his name after an extensive SEC investigation, but not before

being compelled to accept a consent decree barring him from sitting on the board of a public company, and not until after he incurred substantial legal fees necessitated wholly as a result of the fraudulent and deceptive actions of Samel and Galanis.

8.   The foregoing examples of deception and fraud are not the only instances in which the outrageous conduct of Samel and Galanis caused great harm to Guccione. Indeed, Samel and Galanis convinced Guccione not to support the initial GMI plan of reorganization by representing that they could produce an investor who would support a full recovery reorganization plan and would also provide an agreement pursuant to which Guccione would be entitled to continue residing in the townhouse maintained by him (the "Townhouse"), and indeed Samel and Galanis agreed that they (through PII) would acquire the Townhouse to ensure Guccione's living arrangements, and would also compensate him at $1 million per year as Chairman Emeritus for up to 25 years. (The agreement also expressly provided that if Samel and Galanis failed to perform in any way, they would make a single lump sum payment of $15 million to Guccione.)

9.   Guccione, relying on these representations, did not pursue the original plan of reorganization and supported the full recovery plan proposed by Samel and Galanis   In truth, however, the proposed investor (Molina) never tendered an equity investment in GMI, he never had any intention of providing such funding, and Samel and Galanis knew this in advance. Thus, after inducing Guccione to approve a plan based on a representation that the creditors would receive payment in full and he would receive a lucrative employment agreement, Samel and Galanis came through with none of their promises and, as a result, the substitute second plan failed.

10.   Guccione also asserts claims herein against defendants Marc Bell and Daniel Staton, as well as against PMG, all of whom have engaged in, and continue to engage in, a pattern of contract breaches, deceit and misconduct.

11.   In the first instance, Guccione founded and worked at GMI for more than thirty-seven (37) years and he is entitled to a substantial severance based upon his summary termination from PMG by Bell and Staton immediately after the effective date of the Plan of Reorganization in Bankruptcy Court. Ignoring a company severance policy that had been in effect for decades, Bell and Staton, through PMG, fired Guccione as soon as they assumed control of PMG and deprived him of more than a million and a half dollars in severance payments to which he was entitled.

12.   Perhaps more egregious, Bell and Staton fraudulently induced Guccione, in his capacity as CEO and chairman of the various Penthouse companies, to propound and support their fourth amended plan of reorganization in the GMI bankruptcy (the "Fourth Plan") by annexing to the Fourth Plan a ten year agreement which obligated the company to pay Guccione $500,000 per year for consulting, plus $250,000 per year for his assistant and a secretary, once the reorganized company emerged from bankruptcy.

13.   Indeed, as soon as they extracted controlling interest over the reorganized debtor (PMG), Bell and Staton immediately breached that agreement, repudiating their obligations thereunder on what can only be characterized as frivolous and contrived grounds. The obligations in the aforesaid agreement remain due and owing, and indeed are accelerated as a result of Bell's and Staton's breaches. At present, the amounts due exceed $7.5 million, plus legal fees.

14.     As will be described below, Bell and Staton falsely based their refusal to honor the above-referenced contractual commitments upon a claim that Guccione failed to provide them with certain UK trademarks. However, any feigned reliance on those trademarks is an artifice concocted by Bell and Staton as part of an illicit alliance with Samel and Galanis. Indeed, the evidence will show that Samel and Galanis, on the one hand, and Bell and Staton, on the other, entered into a secret deal pursuant to which the former transferred rights (which they claimed to have in the aforementioned trademarks) to the latter so that (1) Samel and Galanis could finally acquire the interests they always coveted in Guccione's companies without providing actual value, and (2) Bell and Staton could avoid honoring the consulting deal done with Guccione by claiming that he did not control and could not convey rights essential to them.

15.     Thus, through the various machinations of all of these co-conspirators, Bell and Staton and Samel and Galanis find themselves precisely where they always intended to be: sitting atop the Penthouse empire and disclaiming any obligation to its founder, Guccione

16.     Finally, and apparently not content with the unscrupulous conduct they already had visited upon Guccione, defendants Bell and Staton, through PMG, recently commenced a lawsuit against Guccione in the bankruptcy court. By that filing, defendants seek to have Guccione "turn over" property to an estate that no longer exists, and to assert meritless claims against Guccione that are barred because, among other reasons, they were released in the Fourth Plan of Reorganization or are untimely due to the statute of limitations. Guccione has moved in that separate bankruptcy proceeding to dismiss all claims. Here, he seeks damages against defendants for their bad faith filing.

435969                                    6

## THE PARTIES

17.     Guccione is an individual residing in the State of New York.

18.     Upon information and belief, defendant Marc H. Bell is an individual residing in the State of Florida.

19.     Upon information and belief, defendant Daniel Staton is an individual residing in the State of Florida.

20.     Defendant PMG is a corporation organized under the laws of the State of Delaware with offices in Florida and in the City, County and State of New York.

21.     Upon information and belief, defendant Charles Samel is an individual residing in the State of California

22.     Upon information and belief, defendant Jason Galanis is an individual residing in the State of California

23.     Upon information and belief, defendant Molina is an individual residing in Mexico City, Mexico.

24.     Defendant PII is a publicly traded corporation organized under the laws of the State of Florida with its principal executive office in Ft. Lauderdale, Florida.

25.     Upon information and belief, defendant IBill is a corporation organized under the laws of the State of Florida with its principal executive office in Deerfield Beach, Florida.

26.     This Court has personal jurisdiction over all of the defendants pursuant to CPLR § 301 and § 302 because these parties reside in and/or transact business within the State of New York.

27.    Venue in this Court is proper pursuant to CPLR § 503(a) and (c) because, inter alia, Guccione and PMG are residents of New York County.

## FACTS

**Background**

28.    Robert C. Guccione is the founder of Penthouse Magazine, the former chairman of General Media Inc. ("GMI") and present chairman of General Media International, Inc. ("GMII").

29.    In or around 1997, GMII, which controlled Guccione's personal interests, was owned two-thirds by Guccione and one-third by a Guccione family trust.

30.    GMII owned 99.5% of GMI, the publishing and media company that controlled substantially all of Guccione's Penthouse business interests, with the other .5% being owned by GMI bondholders. GMII also owned other Guccione holding companies dealing with art, real estate and other initiatives, as well as certain UK Trademarks and the Australian website at issue in recent litigation commenced by PMG against Guccione.

31.    Defendant Samel began working with Guccione in 1997. Through 2002, despite clearly coveting Guccione's publishing companies, Samel only worked on GMII-related matters, which were personal matters for Guccione. (Galanis began working closely on matters for Guccione with Samel by 2000.) By 2001, Samel had become an officer of GMII and its various subsidiary companies. As an officer of GMII and other Guccione companies, Samel owed Guccione a fiduciary duty. Despite this duty, and despite receiving $300,000 in annual compensation and agreeing to accept 5/8 of 1% fee for any transaction that he procured, Samel positioned himself as a consultant who arranged financings and re-financings for Guccione, most of which created devastating

435969                                    8

results for Guccione and his companies, and each of which was utilized by Samel as a means of extracting a hefty fee often in the nature of 5% of the value of the deal.

32.     By mid-1998, a number of the loans securing Guccione's non-income producing holdings were in some form of default. The Townhouse was in default, as was the loan on Guccione's personal art collection. Samel insinuated himself into a pivotal role in the restructuring process early on, advising Guccione of "opportunities" which would supposedly enable him to clean up his financial situation. In each instance, however, the remedy prescribed by Samel created more damage than the original problem and made more money for Samel.

33.     Consider, for example, the manner in which Samel "handled" the art issue. By November 1998, Guccione's subsidiary company had a $50 million art loan that was in default. Samel orchestrated a refinancing pursuant to which (at least as far as Samel told Guccione) he would sell off Guccione's world class art collection in order to raise money to pay off the loan and to generate additional monies which would help resolve issues with a lender named Kennedy Funding, who held the mortgage on the Townhouse. Samel did ultimately arrange for the sale of all of Guccione's artwork, and he managed to extract a hefty ($500,000) fee for himself in the process. When the dust settled, however, Samel did not raise any additional capital, using the monies from the sale of the artwork to pay off only part of the loan, with nothing left to assist the GMI cash flow issue.

34.     In numerous other instances over the next six years, each of which will be explored during the course of this litigation, Samel and Galanis convinced Guccione to address legitimate issues by putting "band-aids" on real financial problems, leaving Guccione and his company in worse financial condition.

## The "Secura Loan"

35.    Through the end of 2002, to offset substantial cash flow problems faced by GMI, Guccione loaned vast amounts of his own money, and borrowed against or sold off millions of dollars of his own assets (often if not always directly arranged by Samel), to create and maintain a positive cash flow at GMI before its bankruptcy filing.

36.    In July 2002, for example, at a time when Samel had already exhausted Guccione's liquid assets and sold off substantial portions of his GMII assets in order to keep GMI afloat, Samel and Galanis introduced Guccione to an "opportunity" in Arizona which was intended to assist Guccione until longer term (permanent) financing could be arranged.

37.    In this transaction, which has been at times referred to as the "Secura Loan," Samel and Galanis proposed that GMII borrow $5 million, and that Guccione guarantee the obligation, at the exorbitant (but apparently not usurious) rate of 5% interest per month. At the time, Samel and Galanis expressly represented that this would merely be a short-term bridge to further financing that they were arranging, and that Guccione would never be personally obligated to repay that loan, because they were about to raise $5 million from other sources. These particular representations were crucial to the continuing vitality of GMI, since the Secura Loan imposed an exorbitant 10% monthly penalty.

38.    Thus, the essential promises made by Samel and Galanis to induce Guccione to enter into the Secura transaction were false when made, and were known by them to be false when made. Indeed, Samel and Galanis were unable to locate any other financing sources and, as a result, Guccione was obligated to make enormous interest

payments (5% per month with a 10% per month penalty) on the Secura Loan, which he could not afford. Guccione had no defense to the payment obligations, the amount of the debt ballooned at incredible interest rates, and Guccione is presently subject to a $22 million personal judgment.

39.     Samel and Galanis have already been sued in Arizona for fraudulent misrepresentations made to the lender in connection with the Secura Loan. By this action, Samel and Galanis induced Guccione to enter into this transaction under false pretenses, and that they are therefore also responsible for his losses in this transaction.

### The PII "Reverse Merger"

40.     Galanis further proposed that, in order to save GMI from various financial difficulties, they merge it into the shell of a public company. Galanis worked out a deal pursuant to which Guccione purchased a public shell company from its original owners for $250,000. The deal, which was ultimately consummated in November 2002, provided that Guccione would receive 85% of the 150 million outstanding shares of the public company (called Penthouse International, Inc., or "PII") in exchange for GMII's 99.5% of GMI. So, in essence, Guccione gave up his interest in GMI for 85% of the shares of the public company. The plan, as explained by Samel and Galanis, was that they would sell the remaining 15% of the company to raise $5 million to help GMI with its substantial cash flow issues. Instead, they took 5% each, sold portions of the stock that they took for personal profit, and raised no monies for the company by failing to sell the remaining 5%.

**The "IIG" Transaction**

41.     Separate and apart from the foregoing PII and Secura transactions, both of which were devastating to GMI and Guccione, Samel arranged another loan transaction, this time in the amount of $1.6 million ($100,000 of which Samel managed to take for himself), with an individual named George Sandhu and his company, "IIG." Samel saw to it that Guccione pledged to Sandhu and IIG the full 85% of PII stock (a total of 130 million shares) that he had obtained from the reverse merger. The aforementioned $1.5 million was actually given to GMI and used to pay off portions of the next bond payment due, but it tied up what was left of Guccione's remaining stock in PII. Moreover, Samel had already defaulted with the bondholders, so the loan was actually set up so that Guccione's PII stock would be collateralized, then defaulted. Actual default occurred thirty days later, when Samel failed to advise Guccione that a $28,000 interest payment had come due.

**The SEC Fraud**

42.     After slowly inserting himself into GMI management, by late 2002 Samel had become the de facto chief operating officer of GMI. By the end of the first quarter of 2003, Samel had become Executive Vice President and Galanis had tried to become involved with GMI management and with the website, Penthouse.com. Even though Samel was not yet an officer of the company, in January 2003 Samel secretly signed a website management agreement with Galanis which was to pay $1 million to GMI.

43.     However, upon information and belief, Samel and Galanis, recognizing that the financials of GMI were not as sound as they had hoped, conspired to file false information concerning the website management agreement to make it appear in the

company 10-Q as if all of the income could be recognized by GMI immediately, rather than properly amortizing it over the life of the agreement, as was required. They sought to pump $1 million worth of income into the earlier reporting period improperly.

44.    Making matters worse, Samel and Galanis actually forged Guccione's signature on the 10-Q and filed it with the SEC without his knowledge. When GMI's accountants saw the 10-Q, they immediately notified the SEC that they had nothing to do with the filing. The SEC then commenced an investigation against Samel, Galanis and Guccione for, among other things, securities fraud.

45.    After an extensive investigation, the SEC dropped its investigation of Guccione on the condition that he accept a consent decree providing that he never again serve as an officer of a public company. Guccione was also compelled to engage counsel and defend himself in the investigation. He is seeking and entitled to recover from Samel and Galanis, as a result of their breach of fiduciary duty to him, the value of the damage to his reputation, as well as the substantial fees which he incurred defending himself. The SEC has since commenced a civil action against Samel and Galanis for their role in the matter.

46.    GMI was no longer able to make bond payments as they came due and Guccione had no further money to infuse into the company. By August 2003, new bond payments were due, no money was being raised from sale of PII stock, the Secura Loan payments were growing astronomically, and the company was compelled to default on the bonds. At that point, Guccione's only recourse was to file GMI into Chapter 11.

## The Beginning Of The Bankruptcy Era

47.     As of August 12, 2003, when GMI filed for bankruptcy, Guccione was the chairman of the company and Samel was the executive vice president. At that time, Samel and Galanis continuously told Guccione to trust them, that they would find investors to replace the existing bondholders, that Guccione could continue running his company as before, and that his retirement, and his lifetime residence in the Townhouse, would be provided for.

48.     In September 2003, a company called Mackay Shields owned 65-70% of the outstanding GMI debt. Bell, who had already made a fortune by virtue of his association with Guccione and Penthouse, running an internet service for GMI, bought the aforementioned bonds by paying between 30 and 50 cents on the dollar.

49.     At that time, Bell and Staton proposed an initial plan of reorganization which would wipe out GMI and PII and leave themselves owning the reorganized company. Bell and Staton proposed that they get ownership in exchange for their bonds while the other bondholders would cash out at par, that the unsecured creditors would receive approximately 15 cents on the dollar, and that shareholders would get nothing. This was "Plan One" and it had a February 2004 deadline, according to Bell and Staton.

50.     In proposing this plan, Bell negotiated a consulting and retirement deal with Guccione which was reflected in the disclosure statement filed with the bankruptcy court. By its terms, Guccione was to receive $500,000 per year for ten years to act as chairman emeritus. He would be able to retain his private assistant (Jane Krynicki) and one secretary (and benefits), and to otherwise receive all executive benefits, including his pension. In exchange for this $750,000 annual package, Guccione would have to convey

the rights to the Penthouse name in the UK to the reorganized company. Guccione agreed to these terms. This initial plan was filed in November 2003.

### The Samel/Galanis/Molina "Plan Two"

51.     As set forth above, "Plan One" was to be concluded by February 2004, except that it could be withdrawn if a better (i.e., fully funded) plan were proposed. From the time that Plan One was initially negotiated, Samel and Galanis viewed this as their "escape hatch," as their way of carving out for themselves a piece of the future ownership of GMI and what else remained of the Penthouse empire. Samel and Galanis therefore advised Guccione, before the February 2004 deadline for the initial plan, that they would be able to come forward with an alternate plan more lucrative for everyone involved.

52.     Specifically, in November 2003, Samel and Galanis presented Guccione with an alternative to Plan One, this time with the help of Molina, son of Enrique Molina, the former owner of the Pepsi Bottling Company of Mexico. Molina represented that he was determined to establish the Penthouse franchise in Mexico and, for the right to do so, he was prepared to substantially finance the reorganized company.

53.     In essence, at the time Guccione still owned 85% of PII, but it remained pledged to IIG, Molina proposed to contribute substantial Mexican real estate to PII. In exchange for that and a proposed $40 million investment, Molina would receive Guccione's 85% of the stock of PII. (As always, Samel and Galanis had orchestrated matters so that they would receive stock as payment for their "services," thus leaving them with more from the transaction than Guccione.) Samel and Galanis convinced Guccione to go forward with this deal by representing that Molina would contribute cash

plus millions of dollars worth of Mexican real estate in exchange for his rights, and that Molina would provide money to acquire GMI out of a new bankruptcy plan.

54.     Under this proposed deal, reorganized GMI was also to receive certain UK Penthouse trademarks that had been owned directly by Guccione. As proposed, all of GMI's creditors were to receive 100 cents on the dollar. Since this plan was clearly more lucrative for creditors than the initial plan proposed by Bell, as the parties moved closer to the Plan One February 2004 deadline, the parties' focus turned away from "Plan One" and turned instead to the Samel/Galanis/Molina "Plan Two."

55.     At this point, in February 2004, Samel was very much determined to obtain Guccione's support for "Plan Two." He and Galanis and Molina therefore proposed that, in exchange for the trademarks and support for their plan, they would pay Guccione $1 million per year for life, and ensure that he had the right to stay in the Townhouse as long as he lived. In the alternative, if he were ever compelled to leave the Townhouse, Guccione would be given the opportunity to stay in a home valued at least at $20 million. If Samel and Galanis failed to deliver on either commitment, Guccione would receive a single lump sum payment of $15 million. Again, Guccione agreed.

56.     All of these commitments were made at or around the eve of confirmation of Plan One. Thus, after the Plan One disclosure statement already had been approved, and at a point when Plan One was about to be confirmed, Samel delivered two documents to make it appear as if he would fulfill the promises being made.

57.     First, Samel delivered a signed commitment letter pursuant to which an entity named "MW Post" agreed to finance up to $35 million of the monies needed to support Plan Two, plus a letter from a Mexican bank concerning Molina's assets, with a

signed commitment letter from Molina to contribute $40 million, indeed as much as needed to fulfill the payment plan. Under Plan Two, the bondholders and the unsecured creditors were to be paid in full. Bell and Staton would receive a substantial profit on their short term investment.

58. The documents delivered by Samel concerning Molina's assets, received at a point in time when Guccione was being (at least temporarily) saved from eviction, gave Samel and Galanis tremendous credibility with Guccione and made it appear as if they would be able to deliver a confirmable plan and honor the commitments they had made to Guccione. Based on the foregoing, Guccione agreed to place company support behind Plan Two, and accepted the terms proposed by Samel, Galanis and Molina.

59 Over the few years preceding the GMI bankruptcy, the Townhouse was under some threat of foreclosure proceedings. In early 2004, Samel purported to take care of this problem by introducing The Laurus Fund ("Laurus"), which loaned $24 million to PII so that it could acquire the Townhouse from Kennedy Funding, a New Jersey-based capital venture fund which had acquired the Townhouse out of foreclosure. As part of the transaction, Laurus was to receive common stock in PII, as well as a mortgage on the Townhouse.

60. However, almost as quickly as they purported to solve these problems, it became clear that Samel, Galanis and Molina had offered only misrepresentations that prevented the implementation of real solutions.

61. For example, even though they had seemingly avoided eviction and ensured Guccione's living arrangements for the remainder of his life, Samel and Galanis soon defaulted on the obligation to Laurus. Since there was a $2 million reserve with

Laurus, it appeared at that point that all was still well with the Townhouse, perpetuating Guccione's right to remain there. By the end of 2004, however, notwithstanding their acknowledgment of the enforceability of the foregoing agreements, Laurus declared a default, thereby sending the Townhouse once again spiraling toward foreclosure.

62.     While "Plan Two" was filed in February 2004 and a May 2004 closing date was set, Samel repeatedly delayed the closing and arranged separate, side deals with Bell and Staton to get more time. Upon information and belief, Bell and Staton extracted numerous terms from Samel and Galanis to extend their time, and this constituted the beginning of the conspiracy between and among the supposedly warring factions.

63.     Ultimately, Molina's commitment to provide financing for Plan Two was revealed to be a sham. As a result, by the summer of 2004, on the eve of confirmation, Plan Two was no longer an option, and Guccione's company appeared to have no exit strategy from bankruptcy.

**The Fourth Amended Plan of Reorganization**

64.     By early August 2004, after a third desultory interim plan led nowhere, GMI and Guccione were left with no plan and no options. Seizing upon this opportunity, indeed perhaps creating this opportunity during the course of their recent "horse trading" with Samel and Galanis, on August 6, 2004 Bell advised Guccione that he and Staton were prepared to go forward with a new version of the original Bell Plan, but only on the condition that the new plan be confirmed within one week. At that time, Bell reaffirmed his commitment to provide Guccione with a deal worth $500,000 per year for 10 years, plus $250,000 annually for benefits and staff, plus the right to continued possession of certain personal property (including furniture) which Guccione had transferred to the

company prior to the bankruptcy to help it meet its covenants with the bondholders. Guccione supported Bell's new proposed plan (the "Fourth Plan").

65.     It is now evident that when Bell reiterated his commitment to honor his deal with Guccione, he had no intention of honoring it. In truth, Bell and Staton simply needed approval by the GMI board of directors to get the Fourth Plan confirmed. Guccione, his daughter Tonina, and Samel were the only three members of the GMI board, and Bell and Staton knew that they needed approval of at least two of the three to assume control of the reorganized company. They therefore made any promises needed to gain Guccione's support, even though they were entirely devoid of substance. This, Guccione will demonstrate, is but one level of the fraud committed by Bell and Staton.

66.     In addition, on the evening before the bankruptcy court hearing, Bell finally disclosed that he had concealed a form of bankruptcy fraud, giving away portions of his bond holdings to friends and family, and to his own attorneys, in order to circumvent the 50% "numerosity" requirement built into the governing statute, which he had committed when the first plan had been propounded. Indeed, Bell was compelled to disclose this revelation on August 12, 2004 because the company insisted on knowing the names of all of the bondholders supposedly supporting the Fourth Plan and he was relying on the same false presentation then as well.

67.     The Fourth Plan was ultimately approved, as Bell and Staton were the only potential sources of re-financing at the time. The court did not, however, address the question raised here, which is whether Bell defrauded Guccione by obtaining his support for the Fourth Amended Plan by falsely representing that he would honor the deal he previously made concerning Guccione's severance and/or consulting agreement.

435969                               19

68. Bell and Staton also obtained the support they needed, in part, through coercion. Specifically, the bankruptcy court record contained affidavit evidence to the effect that, between August 6 and August 12, 2004, Bell called Guccione on several occasions and threatened that if he did not approve Bell's new plan, he (Bell) would throw Guccione into the street.

69. Under those circumstances, where all of Guccione's assets had already been depleted by Samel's and Galanis' wrongful acts, where there were no alternate, legitimate sources of financing available, and where the "downside" to him was too great, Guccione had no alternative but to support the Fourth Plan, and so he did. The Fourth Plan was confirmed October 5, 2004.

**The UK Trademarks**

70. Before the Fourth Plan of Reorganization was finally approved, however, the combination between Bell and Staton, on the one hand, and Samel and Galanis and Molina, on the other hand, reached fruition, and it centered around certain Penthouse trademarks (including the names "PENTHOUSE UK," "PENTHOUSE VARIATIONS," "PETS," the "ONE KEY" logo and the "THREE KEYS" LOGO) owned by Guccione in the UK through his family trust.

71. In May or June 2004, after Samel and Galanis agreed to provide Guccione with continued access to the Townhouse and $1 million per year for consulting, they demanded that he include those trademarks in the deal, and Guccione agreed. Guccione at that time agreed to sell the UK trademarks to Samel for $250,000.

72. However, it soon became clear that Samel and Galanis had misrepresented their intentions and capabilities, and that there was no substance behind their supposed

alternative second plan. At that point, when it became clear to Guccione that Samel and Galanis were not going to deliver either of the two essential components of the deal, and were in fact repudiating their obligations thereunder, Guccione advised them that they had no further rights to the aforesaid trademarks.

73.    In August 2004, when Bell and Staton were negotiating for control of GMI and sought Guccione's assistance (while offering a package of $750,000 per year for consulting), they also requested that Guccione provide the UK trademarks as part of the deal. Since any rights that Samel and Galanis may have had at one point terminated as a result of their own breaches, and since Guccione, acting within his rights, expressly rejected any attempt by Samel and Galanis to enforce the UK trademark deal, he was able to agree to a separate deal concerning the UK trademarks with Bell and Staton.

74.    Thus, before the Fourth Plan of Reorganization was confirmed, Bell and Staton entered into the aforementioned deal with Guccione pursuant to which they agreed to engage him as a consultant for $500,000 per year, plus $250,000 per year for an assistant and a secretary (and benefits), in exchange for which Guccione agreed (among other things) to convey the UK trademarks to PMG.

75.    In truth, Bell and Stanton had no intention of honoring the aforementioned agreement with Guccione, and the entire reference to the trademarks was a sham orchestrated with the assistance of Samel and Galanis, for the express purpose of getting the Fourth Plan of Reorganization confirmed and then dividing the spoils of that conquest without ever paying Guccione. Bell and Staton needed Guccione to champion their plan, they used the promise of his consulting deal to get Guccione on board, then they used the alleged unavailability of the trademarks as a contrived excuse not to honor that deal.

76.     Indeed, once the plan was confirmed, Bell and Staton advised Guccione that they were not going to honor the deal that they had negotiated because he had allegedly already assigned the rights to Samel and Galanis, based supposedly on facts which they knew before they entered their own separate deal with Guccione

77.     Upon information and belief, the aforementioned deal between Samel and Galanis, on one hand, and Bell and Staton, on the other, concerning the UK trademarks, is only a component of the wide-ranging conspiracy to which they are now all a part. Immediately after confirmation of the plan of reorganization, Bell and Staton afforded Samel and Galanis an opportunity to acquire a 37% share of the post-bankruptcy company (PMG), and it is clear that Samel and Galanis were only able to raise the monies necessary to make their investment by falsely representing to third parties that they controlled the UK trademarks. Thus, as matters presently stand, the defendants have taken away Guccione's companies, divided them among themselves, then given nothing to Guccione in return.

**The Severance Claim**

78.     As stated above, GMI had a longstanding policy to the effect that any executive employee who left the company after ten or more years of service would be entitled to receive one month's severance for every year of employment.

79.     Guccione was employed by GMI for thirty-seven years. However, on the day immediately following the confirmation of the plan, PMG, Bell and Staton fired Guccione and his assistant, Jane Krynicki. Guccione's attorney therefore sent a letter to PMG demanding that the severance policy be followed. Defendants Bell, Staton and PMG refused.

**The Bankruptcy Complaint**

80.      Finally, after breaching all of their contractual obligations to Guccione, defendants PMG, Bell and Staton recently filed a meritless action against Guccione in the bankruptcy court. As will be shown, the first three purported claims in that action are in the nature of a "turnover" proceeding, even though the law is quite clear that there can be no such thing as a "turnover" where the plan in question has already been confirmed, as has been the case with GMI for over a year. Moreover, Guccione contributed far more of his personal assets to the continued cash flow of GMI prior to its bankruptcy than he was ever able to recover or offset, and so (but for the bankruptcy estate being closed) he is more accurately described as a creditor of GMI. Thus, the final swipe at Guccione, the bankruptcy complaint recently filed, is yet another example of the bad faith of the various defendants herein.

## FIRST CAUSE OF ACTION AGAINST PMG, BELL AND STATON BASED ON MATERIAL BREACH OF CONTRACT

81.      Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 80 of the complaint as if fully set forth herein.

82.      As set forth above, defendant PMG (as the successor to GMI), acting through defendants Bell and Staton, entered into an agreement with GMII on behalf of Guccione at or about the time the Fourth Plan of Reorganization was confirmed.

83.      Pursuant to that agreement, PMG obligated itself to pay GMII $500,000 per year for a period of ten years, and to provide Guccione with an assistant and a secretary (and benefits) , an expense which the parties agreed would be valued at approximately $250,000 per year.

84.     The agreement expressly provided that the failure by PMG to make payments as they became due shall constitute a material breach and shall entitled GMII (Guccione) to an acceleration of the remaining payments due.

85.     The agreement further provided that any party thereto who was compelled to commence litigation to recover amounts to which it was otherwise entitled would also be entitled to recover its attorneys fees.

86.     Soon after the execution of the aforesaid agreement, PMG, acting through Bell and Staton, breached its obligations thereunder by failing and refusing to make any payments to GMII or Guccione, despite due demands therefore.

87.     As a result of the foregoing and the aforementioned acceleration clause, Guccione is presently entitled to recover $7.5 million from defendants. Moreover, Guccione is also entitled to recover the costs of this litigation, including attorneys' fees.

## SECOND CAUSE OF ACTION AGAINST PMG, BELL AND STATON BASED ON FRAUD

88.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 87 of the complaint as if fully set forth herein.

89.     After commencement of the GMI bankruptcy, Bell and Staton had numerous conversations with Guccione in which they requested he provide consulting services and sought his approval of their own sponsored "Fourth Plan" of reorganization.

90.     As an inducement to convince Guccione to remain in the employ of GMI during the aforementioned bankruptcy and to support their efforts at gaining approval of the Fourth Plan of Reorganization, defendants Bell and Staton offered that GMI (now PMG) would engage Guccione as chairman emeritus at a rate of $500,000 per year for ten (10) years, plus staff and benefits amounting to an additional $250,000 per year.

91.     Guccione relied upon the foregoing offer to compensate him for consulting services provided after the effective date of the plan.  As a result, he continued in the employ of GMI during the balance of the bankruptcy period, he supported the Fourth Plan of Reorganization and he voted as one of only three members of the GMI board of directors to approve the Fourth Plan.

92.     Defendants Bell and Staton made the aforesaid affirmative representations in order to induce Guccione to continue working for GMI and to approve the Fourth Plan of Reorganization.

93.     In truth, however, neither Bell nor Staton had any intention of honoring the aforementioned promises when they were made.

94.     Guccione relied on the aforementioned misrepresentations in agreeing to continue working for GMI and to approve of the Fourth Plan of Reorganization.

95.     Guccione relied on the aforementioned misrepresentations to his detriment.

96.     As a result of the foregoing, Guccione is entitled to damages in an amount to be proven at trial, but believed to be in excess of $7.5 million.  Moreover, because Bell and Staton deliberately misrepresented their intentions, Guccione is also entitled to punitive damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION AGAINST PMG, BELL AND STATON
### FOR UNJUST ENRICHMENT

97.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 96 of the Complaint with the same force and effect as if fully set forth herein.

98.   PMG, Bell and Staton have been unjustly enriched as a result of their wrongful actions. Specifically, each has received substantial value to which they are not entitled.

99.   Guccione, for his part, has been similarly damaged by the actions of defendants PMG, Bell and Staton.

100.   Defendants PMG, Bell and Staton should therefore be required to disgorge any and all value that they have received, in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION AGAINST PMG, BELL AND STATON FOR PROMISSORY ESTOPPEL

101.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 100 of the Complaint with the same force and effect as if fully set forth herein.

102.   Defendants PMG, Bell and Staton made repeated promises to Guccione, relating to their plan to honor existing GMI severance plans, and their agreement to provide Guccione with a long term agreement as chairman emeritus of the reorganized company.

103.   Guccione relied upon the aforementioned promises by, among other things, continuing to devote his time and resources to the company during the bankruptcy proceedings and endorsing and promoting the plan advanced by Bell and Staton.

104.   Because Guccione has detrimentally relied upon the promises made by Bell and Staton, they should not be able to avoid their resulting obligations.

105.   Guccione is therefore entitled to damages in an amount to be determined at trial but believed to be in the amount of $1,541,667, plus $7.5 million, plus interest.

## FIFTH CAUSE OF ACTION AGAINST PMG, BELL AND
## STATON FOR FAILURE TO PAY SEVERANCE

106.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1
through 105 of the Complaint with the same force and effect as if fully set forth herein.

107.    Plaintiff had, until his termination, been employed by GMI, the
predecessor to defendant PMG, for thirty-seven (37) years.

108.    While plaintiff served as chairman and chief executive officer of GMI,
which included the period from his founding of the company in 1967 right up through
and including when GMI filed for bankruptcy, GMI maintained a policy of providing
severance in an amount equal to one month salary for every year that an employee
worked for the company ten years or longer.

109.    During the period leading up to the bankruptcy filing, and indeed even
after GMI filed for bankruptcy, the aforementioned policy was honored.

110.    After commencement of the GMI bankruptcy, Bell and Staton had
numerous conversations with Guccione in which they requested he provide consulting
services and sought his approval of their own sponsored "Fourth Plan" of reorganization.

111.    In reliance on the aforementioned conversations and representations,
Guccione agreed to continue working at GMI (later PMG) through and beyond the
reorganization process and to vote in favor of the Fourth Plan of Reorganization.

112.    After Guccione voted in favor of the Fourth Plan, Bell and Staton obtained
control of GMI, which became PMG, and immediately purported first to terminate the
aforementioned severance policy, then to terminate Guccione's employment. PMG, Bell
and Staton thereupon refused to honor Guccione's right to receive severance payments.

113.   Indeed, notwithstanding the fact that Guccione's rights vested before Bell and Staton obtained control over the successor company, they have now failed and refused to honor that commitment.

114.   By letter dated October 28, 2004, Guccione's counsel (Jay Newman) demanded, based on Guccione's length of service and his $500,000 annual salary as of the time of termination, that he be paid severance in the amount of $1,541,667.

115.   Notwithstanding due demand, neither PMG, Bell nor Staton have made any severance payment to Guccione.

116.   As a result of the foregoing, Guccione is entitled to severance in an amount of $1,541,667, plus interest.

## SIXTH CAUSE OF ACTION AGAINST PII, IBILL, SAMEL AND GALANIS FOR BREACH OF CONTRACT

117.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 116 of the Complaint with the same force and effect as if fully set forth herein.

118.   Defendants Samel and Galanis entered into an agreement with Guccione pursuant to which they agreed to pay him $1 million per year and to provide continued access to the Townhouse or housing valued at $20 million. In the alternative, Defendants Samel and Galanis agreed to pay Guccione a single lump sum amount of $15 million.

119.   Guccione honored his portion of the agreement in all respects.

120.   Notwithstanding the foregoing, and notwithstanding the fact that Samel and Galanis reaffirmed their obligation in this regard by IBill's partial performance, paying their share of the aforementioned compensation component for several months, Samel and Galanis have not made any payments since January 2005.

121.   Moreover, notwithstanding the foregoing and the fact that Samel and Galanis reaffirmed their obligation in this regard by IBill's part performance, Samel and Galanis have failed to continue making those payments, thereby threatening Guccione once again with imminent eviction.

122.   Samel and Galanis have materially breached their agreement with Guccione by repudiating the obligation to pay Guccione his consulting fee or to maintain him in the Townhouse.

123.   Based on the foregoing, Guccione is entitled to payment of $1 million per year for the remainder of his life, plus housing worth $20 million, or a single lump sum payment of $15 million.

### SEVENTH CAUSE OF ACTION AGAINST SAMEL, GALANIS AND MOLINA FOR FRAUD

124.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 123 of the Complaint with the same force and effect as if fully set forth herein.

125.   Defendants Samel, Galanis and Molina made a number of representations to Guccione in order to induce him to support their purported plan of reorganization, in order to induce him not to go forward with other potentially appropriate plans of reorganization, and to otherwise provide them with certain UK Penthouse trademarks.

126.   The various representations made to Guccione, particularly the ones relating to the consideration that they would provide to Guccione, were false and were known by defendants to be false when made.

127.   In truth, defendant Molina, despite having the ability, had no intention to deliver the financial support necessary to go forward with the proposed "Plan Two."

128.   In truth, neither Samel nor Galanis had the ability or the intention to enable Guccione to live in the Townhouse for the remainder of his life.

129.   In truth, neither Samel nor Galanis had the ability or the intention to provide Guccione with $1 million per year for the remainder of his life

130.   Guccione expressly relied on the foregoing false representations.

131.   As a result of the foregoing, Guccione has been damaged in an amount to be proven at trial, but believed to be in excess of $15 million.

132.   In addition, because Defendants' conduct has been willful, Guccione is also entitled to punitive damages in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION AGAINST SAMEL AND GALANIS FOR BREACH OF FIDUCIARY DUTY

133.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 132 of the Complaint with the same force and effect as if fully set forth herein.

134.   As set forth above, Samel and Galanis occupied positions of trust with Guccione and GML

135.   Notwithstanding these positions of trust, Samel and Galanis engaged in a series of acts in violation of that duty.

136.   As set forth above, Samel and Galanis financed and sold off various Guccione personal (GMII) assets without maintaining adequate records. Moreover, Samel and Galanis convinced Guccione to guarantee the Secura Loan by falsely representing that it would be merely a "bridge loan" and that they would be able to conclude a further financing transaction before Guccione would have any obligation to repay any of those egregious interest payments.

435969                                                30

137.    In truth, however, neither Samel nor Galanis ever refinanced the Secura note, leaving Guccione with no assets and what has become a $22 million judgment.

138.    As set forth above, upon information and belief, Samel and Galanis forged Guccione's name on false documents filed with the SEC, recognizing at one time $1 million in income which was required to be amortized over four years, then making it appear (falsely) that Guccione was involved with the aforementioned false filing.

139.    In truth, Samel and Galanis hid their improper conduct from Guccione.

140.    Notwithstanding the fact that Guccione was himself misled and deceived by Samel and Galanis in this regard, he was ultimately compelled to accept a consent decree barring him from serving as an officer of a public company and to incur substantial legal fees to bring the SEC investigation against him to a close.

141.    As a result of the foregoing, Guccione's reputation has been harmed in an amount to be determined at trial but believed to be in excess of $50 million.

142.    Moreover, by virtue of the breach of fiduciary duty by defendants Samel and Galanis, Guccione is entitled to recover punitive damages in an amount to be determined at trial.

### NINTH CAUSE OF ACTION AGAINST SAMEL AND GALANIS
### FOR UNJUST ENRICHMENT

143.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 142 of the Complaint with the same force and effect as if fully set forth herein.

144.    Samel and Galanis have been unjustly enriched as a result of their improper conduct.

145.    They should be compelled to disgorge their ill-gotten benefits.

435969                                                31

146.   Guccione is therefore entitled to damages in an amount to be determined at trial but believed to be in excess of $50 million.

## TENTH CAUSE OF ACTION AGAINST PII, SAMEL AND GALANIS FOR PROMISSORY ESTOPPEL

147.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 146 of the Complaint with the same force and effect as if fully set forth herein.

148.   Samel and Galanis made repeated promises to Guccione concerning payments he would receive in the future and concerning his continued right to reside in the Townhouse.

149.   In each instance, Guccione relied on these representations to his detriment.

150.   Based upon the foregoing, Samel and Galanis should not be permitted to avoid their obligations.

151.   Guccione is therefore entitled to recover an amount to be determined at trial but believed to be in excess of $50 million.

## ELEVENTH CAUSE OF ACTION AGAINST BELL, STATON, SAMEL AND GALANIS FOR CONSPIRACY TO DEFRAUD

152.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 151 of the Complaint with the same force and effect as if fully set forth herein.

153.   Since the conclusion of the GMI (PMG) bankruptcy, notwithstanding their apparent competition for control over PMG, two rival factions, one involving Bell and Staton, and the other involving Samel and Galanis, have joined forces to cause even greater harm to Guccione.

435969                         32

154. For one thing, it is clear that Bell and Staton have conspired with Samel and Galanis concerning the "UK trademarks" such that both groups have sought these assets from Guccione and both have relied upon Guccione's alleged "failure" to deliver them as a basis for refusing to perform their own contractual commitments. In truth, however, Bell and Staton had already cut a side deal with Samel and Galanis to acquire the trademarks and the arguments advanced against Guccione were therefore mere sham.

155. Similarly, it has recently been revealed that the deal between Bell and Staton, on the one hand, and Samel and Galanis, on the other, is much broader than merely relating to the trademarks. Apparently, these supposedly bitter rivals, each of whom have made significant contractual commitments to Guccione, recently put together a deal in which the UK trademarks were transferred to PMG, Molina received various licenses for Penthouse Magazine and clubs in Mexico and other benefits, but none of these benefits have been shared with Guccione.

156. It is also clear that continued cooperation between the supposedly rival factions is essential, as Samel and Galanis have obviously provided Bell and Staton much of the background inside information about Guccione and his assets so that Bell and Staton could prepare the above referenced and recently filed frivolous bankruptcy case.

157. In sum, and as the evidence will show, Bell and Staton and Samel and Galanis have engaged in a massive conspiracy to defraud Guccione.

158. As a result of the foregoing, Guccione is entitled to damages in an amount to be determined at trial but believed to be in excess of $10 million. Moreover, because

435969                                            33

the aforementioned conduct is so egregious, Guccione is entitled to punitive damages in

an amount to be determined at trial but believed to be in excess of $50 million

WHEREFORE, Plaintiff demands judgment as follows:

(a) On the First Cause of Action against PMG, Bell and Staton, for damages in the amount of $7.5 million, plus attorneys' fees;

(b) On the Second Cause of Action against PMG, Bell and Staton, for damages in the amount of $7.5 million, plus punitive damages in an amount to be determined at trial;

(c) On the Third Cause of Action against PMG, Bell and Staton, requiring that PMG, Bell and Staton disgorge all amounts by which they have been unjustly enriched;

(d) On the Fourth Cause of Action, against PMG, Bell and Staton, for damages in the amount of $1,541,667, plus $7.5 million, plus interest;

(e) On the Fifth Cause of Action against PII, Samel and Galanis, for damages in an amount of $1,541,667, plus interest;

(f) On the Sixth Cause of Action against PII, IBill, Samel and Galanis, for damages in the amount of $15 million;

(g) On the Seventh Cause of Action against Samel, Galanis and Molina, for damages in the amount of $ 15 million, plus punitive damages in an amount to be determined at trial;

(h) On the Eighth Cause of Action against Samel and Galanis, for damages in an amount believed to be in excess of $50 million, plus punitive damages in an amount to be determined at trial;

(i) On the Ninth Cause of Action against Samel and Galanis, for damages in an amount believed to be in excess of $50 million;

(j) On the Tenth Cause of Action against Samel and Galanis, for damages in an amount believed to be in excess of $50 million;

(k) On the Eleventh Cause of Action against Bell, Staton, Samel and Galanis, in an amount to be determined at trial but believed to be in excess of $10 million, plus punitive damages in an amount to be determined at trial but believed to be in excess of $50 million;

(l) Awarding plaintiffs their costs and expenses, including attorneys' fees and expert witness fees, prejudgment and post-judgment interest as

allowed by law, and granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
    December 23, 2005

PRYOR CASHMAN SHERMAN &
FLYNN LLP

By: _____
    Jamie M. Brickell
    Ronald Giller
410 Park Avenue
New York, New York  10022
(212) 421-4100

Attorneys for Plaintiff Robert C. Guccione

435969                          35